1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  GEORGE O. HAGEMAN (CABN 332457)
   JARED S. BUSZIN (NYBN 5285838)
5  Assistant United States Attorneys

6      60 South Market, Suite 1200
       San Jose, CA 95113
7      Telephone: (408) 535-5044
       george.hageman@usdoj.gov
8      jared.buszin@usdoj.gov

9  Attorneys for United States of America

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14  UNITED STATES OF AMERICA,          )  CASE NO. 5:24-cr-00226-BLF-8
                                       )            5:24-cr-00226-BLF-10
15         Plaintiff,                  )            5:24-cr-00226-BLF-11
                                       )
16     v.                              )  **UNITED STATES' OPPOSITION TO DEFENSE
                                       )  MOTION TO PRECLUDE THE GOVERNMENT
17  RAUL CORONEL SUAREZ aka "Ray,"     )  FROM WITHDRAWING ITS NOTICE THAT IT
    LORENZO GARCIA Jr. aka "Chito,"    )  WOULD NOT SEEK THE DEATH PENALTY**
18  JOSE SALDANA aka "Chepe,"          )
                                       )  Hearing:    July 15, 2025
19         Defendants.                 )  Time:       9:00 a.m.
                                       )  Court:      Hon. Beth L. Freeman
20                                     )
                                       )
21  _____)

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    RELEVANT BACKGROUND ....................................................................1

III.   APPLICABLE LAW ...................................................................................3

IV.   ARGUMENT ...............................................................................................4

     A.      Defendants' motion is premature because the government has not withdrawn (and may never withdraw) its notice. ...................................................4

     B.      Even if the Court were to reach the merits, prosecutorial discretion and the specific circumstances here support the government's right to file a notice of intent to seek the death penalty. ..........................................................6

           1.      The executive branch has sole authority to decide what crimes it seeks to charge and the attendant penalties it will pursue ...................................6

           2.      The original no-seek notice was not required .........................................8

           3.      The government retains the ability to seek a superseding indictment, including one that alleges additional criminal conduct that would constitute a capital offense ...........................................................9

           4.      The defendants' requested remedy discourages the government from soliciting mitigating information from defendants and targets ...........................11

     C.      None of the arguments in favor of preclusion withstand scrutiny. ....................12

           1.      Ninth Circuit "Precedent" ......................................................................12

           2.      Judicial Estoppel ...................................................................................13

           3.      18 U.S.C. § 3593 ...................................................................................17

           4.      Affirmative Waiver ................................................................................19

           5.      Absence of Funding ...............................................................................20

     D.      The government is not asking for any relief or order from the Court .................21

V.     CONCLUSION ...........................................................................................21

# TABLE OF AUTHORITIES

## CASES

*Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034 (9th Cir. 2011) ................................................................................................................ 6

*Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017) ........................ 4

*Esteras v. United States*, No. 23-7483, 2025 U.S. LEXIS 2382 (June 20, 2025) .............................................................................................................. 17

*Flast v. Cohen*, 392 U.S. 83(1968) ........................................................................ 4

*Jones v. United States*, 527 U.S. 373 (1999) ......................................................... 7

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ........................................................ 5, 7

*Miller v. French*, 530 U.S. 327 (2000) ................................................................. 7

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ....................................... 13, 14, 15

*Pegram v. Herdrich*, 530 U.S. 211 (2000) ......................................................... 13

*Russello v. United States*, 464 U.S. 16 (1983) .................................................... 17

*United States v. Armstrong*, 517 U.S. 456 (1996) ................................................. 7

*United States v. Caceres*, 440 U.S. 741 (1979) ................................................... 11

*United States v. Constanza-Galdomez*, No. SAG-22-409, 2025 U.S. Dist. LEXIS 116725 (D. Md. June 18, 2025) ................................................... passim

*United States v. Crusius*, No. EP-20-CR-00389-DCG, 2020 U.S. Dist. LEXIS 132901 (W.D. Tex. July 28, 2020) ................................................... 8

*United States v. Dangleben*, No. 3:23-cr-0072, 2025 U.S. Dist. LEXIS 93951 (D.V.I. May 16, 2025) ............................................................ 8, 16, 17

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) ........................................ 12

*United States v. Fernandez*, 231 F.3d 1240 (9th Cir. 2000) ........................ 4, 11, 19

*United States v. Gurolla*, 333 F.3d 944 (9th Cir. 2003) ....................................... 6, 7

*United States v. Lorenzo*, 995 F.2d 1448 (9th Cir. 1993) ....................................... 4

*United States v. Loux*, 389 F.2d 911 (9th Cir. 1968) ........................................... 13

*United States v. Martinez*, 536 F.2d 886 (9th Cir. 1976) ..................................... 12

*United States v. McGriff*, 427 F. Supp. 2d 253 (E.D.N.Y. 2006) ....................... 8, 13

*United States v. Nasri*, 119 F.4th 1172 (9th Cir. 2024) ......................................... 5

*United States v. Nixon*, 418 U.S. 683 (1974) ....................................................... 7

*United States v. Ortiz*, No. 3:12-cr-00119-SI, 2012 U.S. Dist. LEXIS 136840 (N.D. Cal. Sept. 22, 2012) ........................................................... 5

*United States v. Slone*, 969 F. Supp. 2d 830 (E.D. Ky. 2013) ......................................... 4, 8, 11

*United States v. Spurlock*, No. 3:23-cr-00022-MMD-CLB-1, 2025 U.S. Dist. LEXIS 89675 (D. Nev. May 9, 2025) ........................................................... passim

*United States v. Tsarnaev*, No. 13-10200-GAO, 2013 U.S. Dist. LEXIS 152703 (D. Mass. Oct. 18, 2013) ........................................................... 8

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) ........................................ 12

*United States v. Waggoner*, 339 F.3d 91 (9th Cir. 2003) ........................................ 12

*United States v. Wilson*, 518 F. Supp. 3d 678 (W.D.N.Y. 2021) ........................................ 7

*United States v. Wilson*, No. 16-20460, 2021 U.S. Dist. LEXIS 130907 (E.D. Mich. July 14, 2021) ........................................................... 7

### STATUTES

18 U.S.C. § 1959 ........................................................... 1

18 U.S.C. § 1963 ........................................................... 1

18 U.S.C. § 3005 ........................................................... 16

18 U.S.C. § 3591 ........................................................... 3, 11

18 U.S.C. § 3593 ........................................................... 4, 17, 20

### OTHER AUTHORITIES

Justice Manual 1-1.000 ........................................................... 4

Justice Manual 1-1.200 ........................................................... 4, 11, 19

Justice Manual 9-10.050 ........................................................... 11, 19

Justice Manual 9-10.180 ........................................................... 2

### CONSTITUTIONAL PROVISIONS

U.S. Const. art. 3, § 2, cl. 1 ........................................................... 4

## I.     INTRODUCTION

The United States opposes the joint motion from defendants Raul Coronel Suarez, Lorenzo Garcia Jr., and Jose Saldana (Dkt. 248)—and subsequently joined by defendant Gustavo Garcia (Dkt. 250)—to preclude the government from withdrawing its July 16, 2024, notice that it would not seek the death penalty for the crimes charged in the indictment.

As a threshold matter, the motion is not ripe and instead amounts to a request for an advisory opinion on a hypothetical scenario insofar as the government has not sought to withdraw its notice and may never do so.  Furthermore, even if the Court were to reach the merits of this hypothetical issue (it should not), the moving defendants would not be entitled to the relief they seek because the law does not prohibit the government from changing its position on seeking the death penalty under these circumstances.  Therefore, this Court should deny the motion.

## II.     RELEVANT BACKGROUND

On April 18, 2024, a grand jury returned an indictment charging eleven members and associates of the Salinas Acosta Plaza Norteño gang with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Dkt. 1.  The count listed thirty-seven "overt acts in furtherance of the racketeering conspiracy" including:

> d) On or about July 19, 2014, GUSTAVO GARCIA and LORENZO GARCIA murdered a man perceived to be associated with a rival gang by shooting him near his residence in Salinas, CA.

> ii) On or about December 2, 2023, RAUL CORONEL SUAREZ and JOSE SALDANA and another Enterprise member murdered a man perceived to have dropped out of the Enterprise by shooting him in Salinas, CA.

*Id.* ¶ 15(d), (ii).  These two murders were also listed in the indictment's "notice of special sentencing factors" against Gustavo and Lorenzo Garcia (for the 2014 murder) and Coronel and Saldana (for the 2023 murder).  *Id.* ¶¶ 16, 17.  The maximum penalty for these four defendants was listed as "life imprisonment." *Id.* at 21–24 (penalty sheets); *see also* 18 U.S.C § 1963(a) (explaining that violations of section 1962 are punishable by "life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment").

Because the indictment alleged murders that *could* have been charged as capital offenses (e.g., 18 U.S.C. § 1959(a)(1)), internal Justice Department policy required the involvement of the Capital Case

1   Section ("CCS").  Justice Manual 9-10.180 (describing reporting requirements when "a capital offense is

2   charged or when an indictment is obtained pertaining to conduct that could be, but has not been, charged

3   as a capital offense").  CCS reviewed the case and authorized the government not to seek the death penalty

4   as to Coronel, Lorenzo Garcia, and Saldana.  Justice Department policy did not mandate that CCS review

5   Gustavo Garcia's 2014 murder insofar as the murder was completed when he was a juvenile.

6          Shortly thereafter, on July 16, 2024, the government filed a notice that "it has elected not to seek

7   the punishment of death against defendants RAUL CORONEL SUAREZ, GUSTAVO GARCIA,

8   LORENZO GARCIA JR., and JOSE SALDANA for the capital crimes charged in the Indictment."  Dkt.

9   144 (no-seek notice) (caps in original).  The government has filed such notices in this district in the past

10  in cases charging RICO offenses, including those that do not charge capital offenses, at the prompting of

11  the district's Criminal Justice Act supervising attorney and/or judges of the Court.

12         In the months since the indictment and since the no-seek notice was filed, the government has

13  continued its investigation into Salinas Acosta Plaza.  That has included interviews with new witnesses

14  and review of materials seized during the May 2024 takedown.  The government also conducted reverse

15  proffers with the moving defendants and their counsel: Coronel (December 17, 2024), Saldana (February

16  11, 2025), Gustavo Garcia (February 11, 2025), Lorenzo Garcia (March 3, 2025).  *See* Hageman Decl. ¶

17  3.  In each reverse proffer, the government discussed new evidence of criminal activity that was being

18  developed post-indictment.  *See id.*  In each reverse proffer, the government mentioned the possibility of

19  a superseding indictment.  *See id.*

20         On February 5, 2025, Attorney General Pam Bondi issued a department-wide memorandum that,

21  among other things, directed the Capital Review Committee to "review no-seek decisions in all pending

22  capital-eligible cases (*i.e.*, death-eligible cases that have not yet resulted in a conviction) charged between

23  January 20, 2021, and January 19, 2025."  Dkt. 248-1 (Attorney General Memorandum) at 3.  The

24  memorandum was widely shared.  The government also mentioned the ongoing review of prior death

25  penalty decisions to at least two of the three moving defendants' respective counsel in conversation.  *See*

26  Hageman Decl.

27         On June 16, 2025, the government informed the moving defendants' counsel via email (and also

28  by phone) that CCS's review of the no-seek decisions for Coronel, Lorenzo Garcia, and Saldana had been

elevated from a smaller intake committee to the full committee. *See* Dkt. 248 at 2–3. The government invited the moving defendants' counsel to meet with the full committee to present any mitigating information for its consideration and asked defense counsel to identify dates/times within the next 60 days (the deadline set by the committee). *Id.* The government also invited defense counsel to submit mitigation packages in advance if they wished. *Id.*

After notifying the moving defendants that the Justice Department's review of the no-seek decisions had been elevated to the full committee, the government understands that all three defendants sought the appointment of learned counsel notwithstanding the fact that the operative indictment does not charge them with a capital offense. *See* Dkt. 248 at 4. Furthermore, to date, the moving defendants have failed to provide their availability for the requested meeting with the Capital Review Committee and have yet to request an extension from the government. Instead, the three defendants filed the instant motion on July 3, 2025, seeking an order from the Court precluding the government from seeking the death penalty. Dkt. 248. Gustavo Garcia joined in the motion on July 5, 2025, notwithstanding the fact that he has not been invited to participate in the meeting with the committee and his case is not being reviewed. Dkt. 250.

At the time of this filing, the government has not decided to seek the death penalty against the moving defendants by way of a superseding indictment charging capital offenses based on the 2014 and 2023 murders alleged in the original indictment. The government's previous intent not to seek the death penalty, noticed on July 16, 2024, remains current. *See* Dkt. 144. A trial on the charge alleged in the indictment has not yet been scheduled.

### III.    APPLICABLE LAW

The Federal Death Penalty Act authorizes the government to pursue a sentence of death where a defendant is convicted of certain offenses. 18 U.S.C. § 3591. In any case charging such an offense, the statute states that if the government believes the circumstances of the offense justify death, the government "shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice" of (1) the government's belief that death is warranted and its intent to seek death if convicted, and (2) the aggravating factors the government proposes to prove

as justifying death.  18 U.S.C. § 3593(a).  The court may permit the government "to amend the notice upon a showing of good cause."  *Id.*  "Good cause" is not defined in the statute.

The provisions of the Federal Death Penalty Act do not address several circumstances where the government is *not* seeking the death penalty.  For example, the statute does not address what kind of notice (if any) is required in that situation.  The statute also does not address whether a voluntarily disclosed "no-seek" notice can be amended and, if so, under what circumstances.  The statute also does not require or otherwise proscribe amendment of any such "notice" in a case that does not charge a capital offense.

The Justice Manual publicly sets forth internal Justice Department policies and procedures.  Justice Manual 1-1.000.  Section 9-10.000 addresses "capital crimes" and was significantly revised in February 2025 by the Attorney General, suspending all changes that had occurred during the previous presidential administration.  *See* Dkt. 248-1 at 3.  The Manual clearly states that "it is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal.  Nor are any limitations hereby placed on otherwise lawful litigation prerogatives of DOJ."  Justice Manual 1-1.200.  Many courts have stated the same, including the Ninth Circuit.  *See, e.g.*, *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000) (the United States Attorneys' Manual guidelines do not create any rights in criminal defendants, even in capital cases); *United States v. Lorenzo*, 995 F.2d 1448, 1453 (9th Cir. 1993); *see also United States v. Slone*, 969 F. Supp. 2d 830, 834 (E.D. Ky. 2013) (collecting cases and noting that "every circuit to have considered the question agrees").

## IV.     ARGUMENT

### A.     Defendants' motion is premature because the government has not withdrawn (and may never withdraw) its notice.

It is a fundamental judicial principle that courts address "cases" and "controversies."  U.S. Const. art. 3, § 2, cl. 1.  They do not issue advisory opinions on issues that are not yet ripe for judicial action.  *Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("the oldest and most consistent threat in the federal law of justiciability is that the federal courts will not give advisory opinions"); *see also Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 821 (9th Cir. 2017) (the duty of the courts to "say what the law is" "is not a license for courts to issue opinions on every legal issue that may come before them").  The doctrine

1    of ripeness "ensures that courts adjudicate live cases or controversies and do not issue advisory opinions,"

2    and "prevents courts from becoming entangled in abstract disagreements" through "avoidance of

3    premature adjudication." *United States v. Nasri*, 119 F.4th 1172, 1183–84 (9th Cir. 2024) (internal

4    citations and quotations omitted).

5       Here, the moving defendants are seeking an advisory opinion on a hypothetical future possibility.

6    No decision has been made as to whether the government will change its position with respect to seeking

7    the death penalty for the conduct alleged in the indictment. The fact that this case is undergoing a review

8    at all is not a guarantee that the government will end up seeking the death penalty. There are other cases

9    in this district (including at least one involving one of the moving defendants' counsel) that have gone

10   through a review and ultimately resulted in the same no-seek decision. Similarly, the fact that this case

11   has been elevated to the full committee is not a guarantee that the full committee will decide to seek the

12   death penalty. The Court's appointment of learned counsel for the moving defendants at their apparent

13   request also has no bearing on whether the government may seek to withdraw its prior notice not to seek

14   the death penalty.

15       The ultimate result at the conclusion of this review process may be a decision to maintain the status

16   quo. Therefore, at this stage, the Court is not presented with a justiciable controversy as to whether the

17   government can withdraw its prior no-seek notice and what limitations, if any, might apply if it sought to

18   do so.

19       The moving defendants cite multiple decisions in arguing that the Court should not "allow the

20   reconsideration process to go forward." *See* Dkt. 248 at 5. None of those cases are binding and only one

21   is from this district (or even from this circuit). In that case, *Ortiz*, Judge Illston did address the merits of

22   the defendant's motion even though the government had not yet decided whether to seek the death penalty,

23   but in doing so, she *denied* the defendant's request "to preclude the government from seeking the death

24   penalty" because of the government's "broad discretion to charge defendants and to seek certain penalties"

25   "even in the capital context." *United States v. Ortiz*, No. 3:12-cr-00119-SI, 2012 U.S. Dist. LEXIS

26   136840, at *10–11 (N.D. Cal. Sept. 22, 2012) (citing *McCleskey v. Kemp*, 481 U.S. 279, 311–12 (1987)).

27   Judge Illston also denied the defendant's request to delay the government's death penalty decision so the

28   defendant could further develop his evidence for the death penalty authorization process because "there is

a strong proscription against the courts interfering with internal government enforcement processes" and "[c]ourts do not have the authority to supervise out-of-court executive procedure in the absence of a constitutional or statutory violation." *Id.* at *11–12 (citing *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003)). Those same principles apply here and demonstrate the impropriety of the moving defendants' request.

The moving defendants also seek to analogize a hypothetical withdrawal of the government's no-seek notice to a futile attempt to amend a previously dismissed civil pleading. This argument is also unpersuasive. Here, the issue concerns the government's initial no-seek notice, not a purported defect in the pleading that initiated the case. The decisions cited by the defendant relate to civil cases addressing a civil standard, and they involve fact-specific instances where a pleading could have been amended but the specifically proposed amendment would not have cured the defect and thus that particular amendment was futile. *See, e.g.*, *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). Here, for the Court to assess whether a notice of intent to seek the death penalty is defective, the Court would need such a notice to review. There is no such notice presented at this time.

The Court and the moving defendants may have concerns about the implications of changes in federal death penalty policy and procedure since January 20, 2025. But until there is a change in the decision in this case, it is simply not ripe for court action.

**B.  Even if the Court were to reach the merits, prosecutorial discretion and the specific circumstances here support the government's right to file a notice of intent to seek the death penalty.**

Even if the Court were to reach the merits of the issue, there are several affirmative reasons why the government has the right to withdraw its no-seek decision and instead seek the death penalty with respect to the conduct alleged in the indictment. The government additionally has the right to seek the death penalty in a superseding indictment charging new death-eligible offenses based on evidence developed post-indictment.

**1.  The executive branch has sole authority to decide what crimes it seeks to charge and the attendant penalties it will pursue**

The decision whether to seek the death penalty with respect to the conduct alleged in the indictment is one that is committed to the executive branch's discretion. As a general matter, courts may not

1    "encroach[] on the central prerogatives" of a coequal branch. *Miller v. French*, 530 U.S. 327, 341 (2000).

2    When judicial process and executive prerogative conflict, courts must "resolve those competing interest

3    in a manner that preserves the essential functions of each branch." *United States v. Nixon*, 418 U.S. 683,

4    707 (1974). Prosecutorial decisions are a "core executive constitutional function." *United States v.*

5    *Armstrong*, 517 U.S. 456, 465 (1996). Furthermore, courts do not have the authority to supervise out-of-

6    court executive procedure in the absence of a constitutional or statutory violation. *Gurolla*, 333 F.3d at

7    950.

8         This remains true even in the capital context. *See McCleskey*, 481 U.S. at 311–12 ("the capacity

9    of prosecutorial discretion to provide individualized justice is 'firmly entrenched in American law,'"

10   including in capital cases); *see also Jones v. United States*, 527 U.S. 373, 376 (1999) ("exercising its

11   discretion under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 et seq., the Government decided

12   to seek the latter sentencing option"). The executive branch does not lose its ability to charge cases (and

13   seek sentences) as it sees fit just because conduct potentially giving rise to a capital offense is involved.

14   The primary decisions relied on by the moving defendants acknowledge as much. *See United States v.*

15   *Constanza-Galdomez*, No. SAG-22-409, 2025 U.S. Dist. LEXIS 116725, at *3 (D. Md. June 18, 2025)

16   ("the Executive is entitled to charge cases as it sees fit, and Congress has authorized the Department of

17   Justice to seek the death penalty in qualifying cases"); *United States v. Spurlock*, No. 3:23-cr-00022-

18   MMD-CLB-1, 2025 U.S. Dist. LEXIS 89675, at *19, 35, 37–39 (D. Nev. May 9, 2025) (noting that "the

19   process the DOJ is going through . . . is an independent process," the notice deadline "was calibrated to

20   respect the government's process and avoid rushing or delaying it," the court "has not sought to impose

21   deadlines on the timing of inter-agency deliberations," and the court "did not intervene in any related

22   internal DOJ matters").

23        Numerous courts across the country have held that because it is the executive branch's decision

24   whether to seek the death penalty, courts should not interfere in that decision or the executive branch's

25   internal deliberative process pertaining to that decision. *See, e.g.*, *United States v. Wilson*, No. 16-20460,

26   2021 U.S. Dist. LEXIS 130907, at *4 (E.D. Mich. July 14, 2021) ("consequently, the separation of powers

27   prevents courts from directing the Attorney General's decision on a request to withdraw a death penalty

28   notice"); *United States v. Wilson*, 518 F. Supp. 3d 678, 682 (W.D.N.Y. 2021) ("the Court also does not

believe it is an appropriate exercise of judicial authority to become involved in the scheduling of a meeting that will impact a charging decision by the government"); *United States v. Crusius*, No. EP-20-CR-00389-DCG, 2020 U.S. Dist. LEXIS 132901, at *10 (W.D. Tex. July 28, 2020) ("the pre-authorization mitigation presentation is not a judicial proceeding presided over by a judge, but part of an 'administrative, discretionary decision-making process of whether to seek the death penalty'"); *United States v. Tsarnaev*, No. 13-10200-GAO, 2013 U.S. Dist. LEXIS 152703, at *3 (D. Mass. Oct. 18, 2013) ("the opportunity extended by the protocol to the defendant to submit information and materials for consideration in the Department's internal deliberations does not create a legal right that can be overseen and enforced by the Court"); *Slone*, 969 F. Supp. 2d at 833–34 ("That discretion includes the decision whether to seek the death penalty.  So, even relying on its administrative and supervisory authority, *the Court may not direct the process by which the government decides whether a death sentence is appropriate*." (emphasis added)).

In each of these cases, the court denied a defense request to interfere with the government's internal deliberative process regarding the death penalty decision (most commonly by delaying the mitigation presentation deadline).  If the mere timing of the meeting is so clearly within the executive branch's function, then surely something as fundamental to the executive branch as whether to charge someone with a capital crime and whether to seek a capital sentence is within the government's sole discretion as well.  *Cf. United States v. McGriff*, 427 F. Supp. 2d 253, 258 (E.D.N.Y. 2006) ("[T]he decision to seek the death penalty is subject to reconsideration. . . . By the same token, the protocols do not foreclose the Attorney General from revisiting a decision not to seek the death penalty; the only apparent limitation is the notice provision of 18 U.S.C. § 3593(a).").

### 2.    The original no-seek notice was not required

While the Federal Death Penalty Act sets forth requirements for when and how the government "shall" file notice of its intent to seek the death penalty, it does not discuss or mandate the inverse.  *See* 18 U.S.C. 3593(a).  That is, the government is not required by this statute to file a notice of intent *not* to seek the death penalty.  Courts sometimes set their own rules to require the filing of notice, but the statute itself does not.  *See, e.g.*, *United States v. Dangleben*, No. 3:23-cr-0072, 2025 U.S. Dist. LEXIS 93951, at *13 (D.V.I. May 16, 2025) (noting court-ordered deadline for filing a Section 3593 notice had expired).

1   And it certainly does not require the government to file such a notice with respect to charges that are not

2   death-eligible.

3   Here, the government opted to file a notice of intent not to seek the death penalty with respect to

4   the indictment on July 16, 2024, shortly after the decision was made by CCS.  *See* Dkt. 144.  The

5   government opted to include Gustavo Garcia in that notice because he was also listed in the special

6   sentencing factor murder in 2014, even though that murder was committed when he was a juvenile and so

7   technically no such death penalty review was required.

8   The government provided this notice, though not required, because it has been sought from the

9   district's Criminal Justice Act supervising attorney and judges of the Court in the past for cases charging

10  RICO offenses in order to facilitate the appointment of learned counsel, where appropriate.  If the Court

11  were to validate the moving defendants' attempt to weaponize this solicited notice against the government,

12  it would merely incentivize the government to avoid providing any such notice in the future until the latest

13  possible date.

14          **3.      The government retains the ability to seek a superseding indictment, including
15                    one that alleges additional criminal conduct that would constitute a capital
                      offense**

16  Separate from the issue of whether the government could seek a superseding indictment to charge

17  capital offenses for the conduct specifically alleged in the original indictment, it is beyond reasonable

18  dispute that the government could pursue a superseding indictment that alleges presently-uncharged

19  criminal conduct against the moving defendants.  It is also beyond reasonable dispute that the government

20  could seek to charge capital offenses in connection with such a superseding indictment, and subsequently

21  pursue the death penalty in connection with those offenses.

22  The possibility of superseding is especially common in large racketeering cases like this one where

23  the government commonly develops additional evidence post-indictment as more witnesses feel

24  comfortable coming forward and providing information to the government, as the results of the takedown

25  operation search and arrest warrants are processed and analyzed, etc.  This large racketeering case is no

26  different.  The government listed thirty-seven overt acts in the original indictment, but only listed two of

27  them as special sentencing factors permitting an increased maximum punishment.  The government

28  mentioned the possibility of superseding (and defense counsel often inquired about the possibility of

superseding) in several conversations with defense counsel.  Without getting into the specifics of an ongoing investigation or secret grand jury proceedings, a superseding indictment has not just been contemplated but actively in the works since long before this death penalty issue arose or the instant motion was filed.

That superseding indictment, which of course depends on a grand jury returning a true bill, may result in the charging of death-eligible offenses.  For example, the government could seek to add a murder in aid of racketeering (i.e., VICAR murder) charge under 18 U.S.C. § 1959(a)(1) for the special sentencing factor murders in 2014 or 2023, or for a murder already listed as an overt act but not yet charged as a special sentencing factor, or for a murder that was not mentioned in the initial indictment at all (either because it had not happened yet at the time of indictment, or because the evidence regarding the incident has strengthened since the initial indictment was returned).  In the event the grand jury does return a superseding indictment charging death-eligible offenses and the government decides to pursue the death penalty as to one or more of those charges, it is expected that at least some of these developments would form the basis of the "good cause" for amendment of the initial no-seek notice pertaining to the current indictment, to the extent such a showing would be required.  This is all hypothetical, however, because no superseding indictment has been returned and no notice has been filed, which is again why the instant motion should be denied as premature.

The moving defendants' position, particularly when considered in the context of a case where a superseding indictment is likely, is extremely broad.  The moving defendants are asking the Court to preclude the government from withdrawing its notice that it would not seek the death penalty, seemingly without limitation.  Taken to its logical conclusion, then, a charged defendant with a no-seek notice could commit further criminal acts as part of the RICO conspiracy (e.g., kill a prison guard or a suspected cooperator in custody) with the reassurance that the government could not seek the death penalty.  Taken to its logical conclusion, no matter what heinous crimes are alleged in a superseding indictment returned by the grand jury, the government cannot *ever* (under the moving defendants' requested remedy) seek death.  Such an order would amount, in essence, to a blanket prohibition on seeking death contradictory to the Supreme Court's long history of death penalty jurisprudence.

**4.      The defendants' requested remedy discourages the government from soliciting mitigating information from defendants and targets**

Finally, because the government decides whether to seek a superseding indictment, a defendant is usually not involved in that decision-making process.  The decision-making process preliminary to the Department's decision is confidential.  *See* Justice Manual 9-10.050.  And yet, in this instance, the government has previewed the possibility of superseding to the defense and has now invited the defense to present any argument and evidence it would like to the Capital Review Committee.  As with the capital case decision-making process as a whole, both pre-2025 and post-2025, the Department of Justice has invited defense participation even though it is an internal agency decision in which the defendant has no right to participate.  Indeed, the invitation to participate is what instigated the defense motion, not the Attorney General's memorandum (which was announced in early February) and not a change in position itself (which has not happened yet and may never happen).

It is true that the procedural process here is different than it was in years past.  But those past internal procedures (or event current internal procedures) do not create any substantive rights.  *See Fernandez*, 231 F.3d at 1240 (the United States Attorneys' Manual guidelines do not create any rights in criminal defendants, even in capital cases); Justice Manual 1-1.200 (same).  To be clear, the government independently must consider mitigating factors even absent a presentation by the defense.  *See* 18 U.S.C. § 3591 *et seq*.

However, if the Court were to issue an advisory opinion at this stage and find that the government is precluded from withdrawing its notice of intent not to seek the death penalty, it would discourage the government from soliciting mitigation evidence and argument from defendants in the future.  *See United States v. Caceres*, 440 U.S. 741, 755–56 (1979) (rigid application of judicial remedies for the violation of internal law enforcement policies "could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures"); *see also Slone*, 969 F. Supp. 2d at 838–39 ("intrusive micromanagement of the Justice Department might deter the development of policies like the Protocol or even cause DOJ to abandon it altogether").  Such a ruling, which the moving defendants did not seek until the government invited them to present mitigating information, would incentivize the government to avoid soliciting information in the future from defendants that could inform the decision

1  about whether to seek the death penalty.  This unfortunate result could be extended to other instances

2  where the government is receptive to receiving information that could inform prosecutorial decision-

3  making, such as pre-indictment discussions with the target of an investigation.

4        **C.**      **None of the arguments in favor of preclusion withstand scrutiny.**

5        The moving defendants make five arguments for why the government should be precluded from

6  withdrawing its notice of intent not to seek the death penalty: Ninth Circuit precedent, judicial estoppel,

7  18 U.S.C. § 3593, affirmative waiver, and absence of funding.  *See generally* Dkt. 248 at i.  All five

8  arguments fail.  Thus, even if the Court were to reach the merits of the issue, the motion should be denied.

9        **1.**      **Ninth Circuit "Precedent"**

10        The moving defendants claim that "three cases from the Ninth Circuit definitively indicate that the

11  government's filed Notice that it would not seek the death penalty is irrevocable." Dkt. 248 at 7–8 (citing

12  *Loux*, *Martinez*, and *Waggoner*).  That is definitively not so.

13        *Waggoner*, a binding Ninth Circuit case, does mention "the government's *irrevocable* decision not

14  to pursue the death penalty," but only in the context of whether Waggoner was entitled to an additional

15  court-appointed learned counsel.  *United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (emphasis

16  added).  The court does indeed use the word "irrevocable," but it is not part of the holding and the case

17  does not discuss (at all) why such a decision would be irrevocable.  It is mere dicta, and dicta does not

18  have precedential value.  *See United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (citing Black's

19  Law Dictionary 1100 (7th ed. 1999) (defining dictum as a statement in an opinion that is "unnecessary to

20  the decision in the case and therefore not precedential")), *overruled on other grounds by United States v.*

21  *Duarte*, 101 F.4th 657, 661 (9th Cir. 2024).

22        *Loux* and *Martinez*, both decided approximately half a century ago long before the modern Federal

23  Death Penalty Act and before seminal death penalty cases like *Gregg v. Georgia*, are also distinguishable.

24  In *Martinez*, the court denied the defendant's request for 20 peremptory challenges because "*under such*

25  *circumstances*, a death penalty was impossible."  *United States v. Martinez*, 536 F.2d 886, 890 (9th Cir.

26  1976) (emphasis added).  Those circumstances are critical because the government agreed by way of a

27  stipulation four days before trial that it would not seek the death penalty; the judge received that stipulation

28  and then informed the jury.  *Id.* at 889.  Changing course at that stage "under such circumstances" would

certainly wreak havoc and thus be "impossible."  The same cannot be said of the circumstances here in the instant case, where there is still ongoing discovery production and plea negotiations, and no trial date has been set.  In *Loux*, the court again said that a "death penalty was impossible," this time after the government stated so orally on the record and the judge confirmed that they would be "bound" by that decision.  *United States v. Loux*, 389 F.2d 911, 915 (9th Cir. 1968).  The court noted that the government failed to assert the rights accorded to them by the statute and the rule.  *Id.*  That is different from the instant case where the government is asserting its right to later file a notice of intent to seek the death penalty in conjunction with a new charging document (if obtained).

The purportedly "irrevocable" nature of the government's no-seek decision is far from "definitive" as the moving defendants suggest.  *Constanza-Galdomez* acknowledges just that:

> It is not hard to imagine some circumstance where reversing a prior no-seek decision could be proper. For example, the government could discover substantial new evidence while a case was pending that it was unaware of before CCS proceedings. This Court need not define those bounds in this case, but declines to find that the government automatically waived its right to seek the death penalty by filing a no-seek.

*Constanza-Galdomez*, 2025 U.S. Dist. LEXIS 116725, at *35; *see also McGriff*, 427 F. Supp. 2d at 258 ("the protocols do not foreclose the Attorney General from revisiting a decision not to seek the death penalty").

### 2.    Judicial Estoppel

The moving defendants also claim that judicial estoppel forms an independent basis to preclude the government from withdrawing its no-seek notice.  Dkt. 248 at 9.  Not so.

As an initial matter, judicial estoppel applies only with respect to *legal* positions taken by a party. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citing *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) ("This rule, known as judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an *argument* and then relying on a contradictory *argument* to prevail in another phase.'" (emphasis added)) and 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one *theory*, and then seek an inconsistent advantage by pursuing an incompatible *theory*" (emphasis added))).  If the government asserts one interpretation of the law to gain an advantage, and then takes a

later opposite (or inconsistent) interpretation of the law to gain an advantage later, judicial estoppel doctrine steps in. That is not what is happening here. The government has not taken the position that its no-seek notice was irrevocable, only to reverse itself later on that legal point. And even if the government were to later notice an intent to seek the death penalty, that would merely be a change in a procedural or factual position, not a change in a legal argument or theory. Judicial estoppel does not require a case to stay completely static.

Even if the Court were to take a more expansive view of the positions to which judicial estoppel potentially applies, the doctrine would still not justify the relief the moving defendants seek. There are three factors that typically inform the decision whether to apply the doctrine: (1) a party's position must be clearly inconsistent with its earlier position, (2) whether the party has succeeded in persuading a court to accept that party's earlier position so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire*, 532 U.S. at 750–51. None of these factors support the defense's position.

First, the government's position must be clearly inconsistent. Here, there has been no change in *any* position because the government's no-seek notice remains the one and only current notice. Furthermore, even if the government were to change its position regarding its intent to seek the death penalty, that would not be "clearly inconsistent with its earlier position." The government's earlier notice states that it intends not to seek death "for the capital crimes charged *in the Indictment*." Dkt. 144. Because the current indictment contains no capital-eligible offenses, a "change" in position is in some ways a legal impossibility. That distinguishes this case from *Spurlock*, for example, where the government's previous no-seek was noticed at a time when there were capital offenses on the charge sheet. *See Spurlock*, 2025 U.S. Dist. LEXIS 89675, at *3. Moreover, given the no-seek notice's reference to the present indictment, the notice has no bearing on the government's position as to whether it will charge capital offenses and seek the death penalty in a hypothetical superseding indictment.

Second, the government must have succeeded in persuading the court on an earlier occasion. The government's earlier position here—the no-seek notice filed in July 2024—did not entail any sort of

persuasion.  The government was not trying to persuade the court to take some action.  It was not tied to a motion or in anticipation of any motion.  It was simply a record of what had already been acknowledged: that the defendants were not currently charged with any capital-eligible offenses.  There was subsequently an election in November 2024, a change in administration in January 2025, and a new policy announcement in February 2025.  None of those events was anticipated at the time of the no-seek notice in July 2024, and the government of course did not have advance knowledge of any.  Judicial estoppel doctrine is meant to protect against parties from "playing fast and loose" with the courts, but this is not one of those situations.  *New Hampshire*, 532 U.S. at 750.  As *Constanza-Galdomez* acknowledges, "elections have consequences, and this administration is entitled to pursue the death penalty in cases where it can do so in accordance with constitutional and statutory requirements."  *Constanza-Galdomez*, 2025 U.S. Dist. LEXIS 116725, at *32.  The particular circumstances in *Constanza-Galdomez* led the court in that case to believe it was not such a case.  But those circumstances are not present here.

Third, the government must derive an unfair advantage or impose an unfair detriment on the defense if not estopped.  There is no question that capital cases are different from non-capital cases in a number of ways.  *See Constanza-Galdomez*, 2025 U.S. Dist. LEXIS 116725, at *4.  But the question is whether a hypothetical change in government position, at this stage in the case, would impose an unfair advantage or an unfair detriment.  It would not.  The defense describes this case as being at a "late stage" or "late hour," but it is decidedly not.  *See* Dkt. 248 at 11, 15.  Racketeering cases are long affairs, and this case is still early by those standards.  Indeed, there is no trial date at all.  The moving defendants claim they might have sought a speedy trial had they known this might become a death case, but that claim rings hollow given the significant amount of discovery the government has diligently produced in this case, consisting of more than eight packages spanning hundreds of thousands of pages and hundreds of gigabytes of data.  *See* Hageman Decl. ¶ 5.  The government has provided specific Bates number citations in the reverse proffers to help counsel narrow in on the most important documents, *see id.*, but the fact remains that the discovery in this case is voluminous and the defendants would want to diligently review that discovery before proceeding to trial in a case where they presently face potential life sentences.  Furthermore, it strains credulity that the moving defendants would have tried to move the case *faster* (i.e., go to trial in less than one year) had it been charged initially as a death penalty case.  If anything, the

1  procedures followed here have given the moving defendants a benefit to which they are presently not

2  entitled insofar as the government's notice to the moving defendants regarding the review process has

3  enabled them to have learned counsel appointed notwithstanding the fact that this is still presently a non-

4  capital case.  *See* 18 U.S.C. § 3005 (discussing assignment of learned counsel for a "capital crime").

5      The circumstances here are easily distinguishable from the defense's non-binding, out-of-district

6  authority: *Spurlock*, *Constanza-Galdomez*, and *Dangleben*.  In *Spurlock*, the court granted a motion to

7  strike the government's notice of intent to seek the death penalty filed "at the eleventh hour" a mere 12

8  days before the start of trial even though there had been "no significant case-related investigatory

9  developments" since the government's previous notice of intent not to seek the death penalty.  *Spurlock*,

10  2025 U.S. Dist. LEXIS 89675, at *1-2.  The notice of intent to seek the death penalty came after four

11  superseding indictments and followed a mitigation presentation by the defense to the Capital Case Review

12  Committee.  *Id.* at *15, 17.  Additionally, the court had issued a deadline for the government to file its

13  death penalty notice—a deadline to which the government had consented, and which had long since passed

14  without the government asking for an extension.  *Id.* at *28.  In the instant case, the government has not

15  filed a notice of intent to seek the death penalty, let alone twelve days before trial, there are significant

16  investigatory developments since the no-seek notice was filed, the government has not superseded yet (as

17  it often does in racketeering cases), and there is no court-ordered notice deadline that has passed.

18      In *Constanza-Galdomez*, the court granted a motion to strike the government's notice of intent to

19  seek the death penalty, issued at the "eleventh hour" twenty weeks before the start of a "long-scheduled

20  trial" and just five days before the deadline for substantive motions, in a case that included no death-

21  eligible counts "from its inception."  *Constanza-Galdomez*, 2025 U.S. Dist. LEXIS 116725, at *2.  The

22  government's eventual superseding indictment added death-eligible charges but contained no new factual

23  allegations.  *Id.* at *14.  None of those considerations are present here.

24      In *Dangleben*, the court had set a deadline for an 18 U.S.C. § 3593 notice, set a deadline for

25  discovery, and even set a trial date.  *See Dangleben*, 2025 U.S. Dist. LEXIS 93951, at *4.  None of those

26  facts exist in the instant case.  Moreover, even in *Dangleben*, the court determined that judicial estoppel

27  did not apply.  *Id.* at *6 ("the Court agrees with the Government that neither [judicial estoppel nor laches]

28  doctrine applies and, therefore, does not address them herein").

### 3.    18 U.S.C. § 3593

The moving defendants also assert that any subsequent change in the government's intent to seek the death penalty would violate 18 U.S.C. § 3593. Dkt. 248 at 16. The plain language of the statute says differently. Section 3593 sets forth requirements for when and how the government should file a notice that "*a sentence of death is justified*," explaining that it must identify aggravating factors and do so "a reasonable time before trial." 18 U.S.C. § 3593(a) (emphasis added). Even *Spurlock* acknowledges as much, saying "the statute makes no reference to *no-seek* notices; although it includes a clause on amendment, the statute is silent on the possibility of amending a no-seek notice to become a death notice." *Spurlock*, 2025 U.S. Dist. LEXIS 89675, at *59 (emphasis in original). *Spurlock* very clearly does not "decide as a matter of statutory interpretation whether Section 3593 prohibits reversal of a no-seek decision *altogether*." *Id.* at *62 (emphasis in original). Nevertheless, the moving defendants leap from the statute's silence on the matter to conclude that any subsequent change would be prohibited. That is not supported by basic canons of statutory interpretation (including the canon cited in the defense motion). *See* Dkt. 248 at 17 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"); *see also Esteras v. United States*, No. 23-7483, 2025 U.S. LEXIS 2382, at *2 (June 20, 2025) (describing "the well-established canon of statutory interpretation—*'expressio unius est exclusio alterius'*—which means that expressing one item of an associated group excludes another item not mentioned").

Borrowing from *Spurlock*'s non-binding interpretation, the moving defendants assert that even if a change in position is not barred by 18 U.S.C. § 3593, the government should still be required to show "good cause" for any amendment. Again, the plain language of the statute does not say that. It speaks of amending "the notice" that "a sentence of death is justified" upon a showing of "good cause," but does not address whether filing a seek notice (after having previously filed a no-seek notice) constitutes an "amendment" let alone one that requires "good cause." *Spurlock*, 2025 U.S. Dist. LEXIS 89675, at *59 (citing 18 U.S.C. § 3593). The statute "does not provide further guidance on the meaning of good cause, and there is no binding Ninth Circuit authority on point." *Id.* at *62; *see also Dangleben*, 2025 U.S. Dist. LEXIS 93951, at *13 n.7 (questioning whether the government can amend without "good cause," but

1    ultimately declining to address the issue). The reason why Congress might not have addressed such a

2    situation makes sense: the fundamental decision whether to seek the death penalty falls squarely within

3    the executive branch as an exercise of prosecutorial discretion.

4            That said, even if the Court were to find that the "good cause" requirement set forth in Section

5    3593 applies to a no-seek notice, the government may well have good cause to ultimately seek the death

6    penalty with respect to the moving defendants. As stated above, the government has continued to

7    investigate Salinas Acosta Plaza and the moving defendants since the initial indictment was returned and

8    the no-seek notice was filed. The evidence developed through that ongoing investigation could inform

9    whether the death penalty is warranted. Although the moving defendants assume "the information

10   supporting the [hypothetical] change in notice was in the possession of the government at the time of the

11   original notice," that is not true. *See* Dkt. 248 at 27. For example, the ongoing investigation has developed

12   new information pertaining to (i) the two murders already listed as special sentencing factors (i.e., the

13   evidence has gotten stronger), (ii) incidents known to the government pre-indictment but for which the

14   evidence may not have been strong enough at the time to identify a defendant by name, and (iii)incidents

15   that had not yet taken place at the time of the indictment. In each of the reverse proffers with the moving

16   defendants, the government provided information about new post-indictment developments. *See*

17   Hageman Decl. ¶ 3. Additionally, post-indictment developments have been included in some of the

18   discovery productions to the defense. Some developments were left vaguer than others due to the fact that

19   they are heavily based on cooperator information and the government has reasonable concerns about those

20   cooperator(s)' safety and security. The government will not share the specifics of these new developments

21   here out of respect for the fact that they are not yet alleged (and may not be alleged) in any charging

22   document. These developments may result in a subsequent notice of intent to seek the death penalty,

23   which remains hypothetical at this point. This consideration further distinguishes the instant case from

24   *Spurlock* or *Constanza-Galdomez*, and again emphasizes why the defendants' motion is premature. *See*

25   *Spurlock*, 2025 U.S. Dist. LEXIS 89675, at *1-2 (noting "no significant case-related investigatory

26   developments since government's previous notice); *Constanza-Galdomez*, 2025 U.S. Dist. LEXIS

27   116725, at *20 (noting "no new factual allegations" in the superseding indictment).

28

Should this Court decide that a "good cause" determination must be made at this time, the government requests the opportunity to present evidence that would satisfy that standard (which would likely involve *in camera* review of materials whose distribution is prohibited by law). By not including that evidence in this public filing, the government does not waive its right to present such evidence in the future or argue that the "good cause" standard has been met.

### 4.   Affirmative Waiver

The moving defendants additionally assert that the government failed to reserve the right to modify or reverse its "final decision," and then waited too long to assert such a right, thereby resulting in forfeiture or waiver of the right. Dkt. 248 at 22–23. Not so.

First, nowhere in the notice does it say this is a "final decision." Dkt. 144. In fact, it specifically describes the intent not to seek death "for the capital crimes charged *in the Indictment*," which implicitly excludes any capital crimes charged in a Superseding Indictment. *Id.* (emphasis added). The defense draws the "final decision" language from the Justice Manual which again is an internal policy document that does not create any substantive or procedural rights. *See* Justice Manual 1-1.200; *Fernandez*, 231 F.3d at 1246 (U.S. Attorneys' Manual does not create any substantive rights, even in capital cases). But if anything, the Justice Manual also supports the government's position here because it emphasizes repeatedly that "*the Attorney General* will make the final decision whether to seek the death penalty." *See* Justice Manual 9-10.050 (emphasis added). It is therefore the government (and specifically the Attorney General) that makes a death decision, not a defendant through a motion to preclude.

Second, the moving defendants' argument seeks to impose a requirement to pre-reserve rights that is not present anywhere in the statute. The government is not required to reserve its right to change its intent regarding the death penalty any more than it is required to reserve its right to seek a superseding indictment or any number of other decisions of prosecutorial discretion that will significantly shape the course of a case. Otherwise, the government would need, at the time of the initial appearance, to reserve a laundry list of hypothetical possibilities: seek a superseding indictment, add a co-defendant, add a charge, dismiss a charge, seek remand (if released), seek to relate cases, seek a bench trial, seek a jury trial, seek an exclusion of time, set a speedy trial date, etc.

Third, while the government's decision-making timeline is not limitless, the statute itself provides some guidance: the government shall file a notice of its intent to seek the death penalty "a reasonable time before the trial."  18 U.S.C. § 3593(a).  There is no other specific deadline in the statute.  Thus, "a reasonable time before the trial" is the applicable time limitation, not the arbitrary "it has been a year which is too long" rule proposed by the moving defendants, or their suggestion that they must know from the time of charging whether it is a death case or not.  The presumed purpose of the rule is to ensure that a defendant has sufficient time to prepare his case with respect to both the guilt phase and the penalty phase given the uniquely bifurcated nature of capital trials.  Here, no trial date has been set or even discussed.  And while the one-year lapse in time is not insignificant, that must be viewed in the context of federal racketeering cases which often span several years.

### 5.    Absence of Funding

The moving defendants also mention the projected lack of Criminal Justice Act (CJA) panel funding, starting sometime between July 7 and July 23 and continuing through the end of the fiscal year for an estimated 49 business days.  *See* Dkt. 248-3 (CJA Memorandum).  While it appears that unpaid FY2025 vouchers will still be paid when funding becomes available in FY2026, *see id.*, the government is sympathetic to the moving defendants' reasonable concern that providers might be reluctant to perform work under these financial circumstances, *see* Dkt. 248-7 (Shifman Declaration).  However, the additional funding and assistance of learned counsel is ultimately geared, not towards facilitating an effective presentation at a discretionary meeting with the government, but rather to ensure that a defendant who is convicted after a trial has a meaningful ability to convince a jury not to impose death.  Here, a trial and sentencing proceeding are a long ways away.

Given the moving defendants' concern, it would seem that the most prudent course of action would have been for them to request that the presentation to the committee occur at a later date on account of the projected temporary funding lapse and, absent such a continuance, devote their resources to preparing for the presentation.  They elected not to take that approach.  Instead, they sought to use their compensable time and resources to seek a court order that would interfere with the executive branch's internal deliberative process and potentially infringe on core aspects of prosecutorial discretion.  While the moving defendants are within their rights to pursue such a strategy, it is misguided for the reasons stated above.

**D.    The government is not asking for any relief or order from the Court.**

The moving defendants ask the Court to preclude the government from withdrawing its notice that it would not seek the death penalty.  In the alternative, they implicitly argue that the government's 60-day deadline for this meeting with the full committee should be extended indefinitely so that they can conduct more investigation.  The moving defendants previously alluded to requests for pre-authorization discovery related to the government's review, but they do not appear to make such a request at this time and so the government does not address that issue in its response here; should that change, the government requests the ability to respond in full.

All that said, while the government opposes the moving defendants' requests for judicial action, the government is not asking the Court to order the inverse.  It is *not* asking the Court to uphold the government's internal 60-day deadline, nor is it asking the Court to order the parties to make their presentations.  It is *not* asking the Court to hold prospectively that a decision to seek death in this case is permissible.  The government is not asking for any relief from the Court because it does not believe these issues are ripe.  The current Capital Review Committee review is an internal deliberative process, the moving defendants were invited to make presentations and submit evidence (if they wished), no decision has been made as to whether the government may eventually seek the death penalty, and there has been no change in position.

## V.    CONCLUSION

Accordingly, the Court should deny the motion to preclude the government from withdrawing its notice that it would not seek the death penalty as premature or, if reaching the merits of the issue, unsupported by the law.

DATED:  July 10, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

 */s/*
GEORGE O. HAGEMAN
JARED S. BUSZIN
Assistant United States Attorneys