CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

GEORGE O. HAGEMAN (CABN 332457)
JARED S. BUSZIN (NYBN 5285838)
Assistant United States Attorneys

    60 South Market Street, Suite 1200
    San Jose, California 95113
    Telephone: (408) 535-5044
    George.Hageman@usdoj.gov
    Jared.Buszin@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>   v.<br><br>JOSE SALDANA a/k/a "Chepe,"<br><br>    Defendant. | **CASE NO. 5:24-CR-00226-BLF-011**<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Court:      Hon. Beth L. Freeman<br>Hearing Date:  March 10, 2026<br>Hearing Time:  9:00 a.m. |

UNITED STATES' SENTENCING MEMORANDUM
5:24-CR-00226-BLF-011

## I.    INTRODUCTION

Jose Saldana is one of the young shooters within the Salinas Acosta Plaza (SAP) Norteño street gang.  On December 2, 2023, he shot and killed a Norteño "dropout" who was trying to make a living delivering furniture in Acosta Plaza.  On February 29, 2024, he shot and struck (but did not kill) a different Norteño dropout as he was sitting in his car in Acosta Plaza.  Saldana committed both shootings as an adult—aged 18 and 19, respectively—shortly before his arrest on the federal indictment in May 2024.  He was also involved in drug trafficking in January 2023 and possessed a homemade knife while in custody in November 2024.  Based on the need for the sentence to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, and to protect the public, the government submits that 264 months' (22 years) imprisonment is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a).

## II.    PROCEDURAL HISTORY

On April 18, 2024, the defendant and ten other members of SAP were indicted by a federal grand jury on one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Dkt. 1.  On October 21, 2025, the defendant pleaded guilty.  Dkt. 351.  Sentencing is currently set for March 10, 2026.

## III.    OFFENSE CONDUCT

a.  *The Enterprise: Salinas Acosta Plaza (SAP)*

SAP is a criminal street gang that operates in Salinas, CA, within the larger collection of Norteño criminal street gangs that align with the Nuestra Familia (NF) prison gang and funnel taxes and proceeds from their crimes on the street to Nuestra Familia gang members in prison.  Norteño gang members associate with the color red, and the number "14" (signifying "N" as the 14th letter of the alphabet), including any variations of the number such as "4" and "XIV."  PSR ¶ 12.

SAP originated in the 1990's in the Acosta Plaza apartment complex in Salinas at and around the 900 block of Acosta Plaza.  The gang claims that apartment complex as its territory.  SAP commonly uses the letters and numbers "SAP," "A," "P," "900" and "914," as well as the color red, to identify itself.  SAP members also commonly wear clothing of the Atlanta Braves and Philadelphia Phillies baseball teams to represent the gang, given that the symbols of these teams prominently feature the letters "A" and "P".  *Id.*

UNITED STATES' SENTENCING MEMORANDUM    1
5:24-CR-00226-BLF-011

¶ 13.   These symbols are commonly, though not universally, displayed by SAP members in tattoos, graffiti, drawings, hand signs, on clothing, and in photos, rap videos, and social media posts as a way of displaying their affiliation, loyalty, and commitment to the gang. *Id.* ¶ 14.

SAP's primary rivals are Sureño gang members. Sureños recognize the primacy of the Mexican Mafia prison gang, doing the bidding and following orders of Mexican Mafia members. For symbols, they claim the color blue and the number 13 (M is the 13th letter of the alphabet). The rivalry between Norteño and Sureño gang members in Salinas has resulted in numerous acts of violence, including murders, attempted murders, shootings, and assaults. Additionally, SAP members very often target victims who they perceive to be Sureño gang members but who are not actually gang-affiliated, which has led to several murders and attempted murders of non-gang-affiliated victims. *Id.* ¶ 15.

In order to gain entry into the gang, aspiring SAP members may be encouraged or required to put in "work," which is understood to mean criminal conduct such as shootings, robberies, and drug sales. SAP members gain admission, earn status and respect, and rise in rank by committing criminal acts that benefit the gang and/or by spending time in jail or prison for the same. *Id.* ¶ 16. SAP members engage in acts of violence, including acts involving murder and assault, against their rivals and, at times, fellow Norteños considered to have violated the gang's rules. SAP members also traffic in controlled substances and firearms. Violence is often the quickest way to gain admission and/or status for the individual gang member. Members are also expected to pay dues to the gang, with greater dues required of those members who traffic in controlled substances. The dues are used, in part, to acquire firearms for distribution, possession, and use by SAP members. *Id.*

SAP members meet and work together to carry out illegal activities for the benefit of SAP and its membership, and also to benefit, more generally, the Norteños and the NF. SAP members fight with other street gangs for control of territory from which they conduct drug trafficking and other crimes, and recruit and intimidate non-gang members. SAP members engage in acts of violence and intimidation to control illegal activities, to claim or maintain established territory, to retaliate against a rival gang or suspected rival gang member, to earn notoriety and respect, to dissuade potential victims and witnesses from reporting crime or cooperating with law enforcement, to discipline fellow gang members, and to send a

message to others that they are strong, powerful, and not to be provoked. *Id.* ¶ 17.

b. *Defendant's Role in SAP*

From at least April 2022 and continuing through at least November 2024, the defendant has been an SAP Norteño gang member or associate. *Id.* ¶ 19. During this time, he agreed to conduct and to participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity. As an Enterprise member, he knew and agreed that Enterprise members would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise, including acts involving murder, robbery, narcotics trafficking, and witness intimidation – all in service of the Enterprise and its interests. He wore clothing with the color red or the letter "A" or "P" and also flashed "A" and "P" hand signs on social media to demonstrate his membership in, and for the promotion of, SAP. His gang moniker is "Chepe."

On January 29, 2023, at the age of 18, the defendant knowingly possessed 38.8 grams of cocaine, 5.6 grams of methamphetamine, and 69 fentanyl-laced M30 pills. *Id.* ¶ 20. The defendant agrees that the "converted drug weight" for those controlled substances under the United States Sentencing Guidelines is between 20kg and 40kg. *See* Dkt. 351 ¶ 2(h). He knowingly possessed these controlled substances with the intention of selling them to another person. To arrange the sale of these controlled substances, he would place phone calls, send text messages, and use social media applications on his smartphone. He intended to sell these drugs for personal profit and to pay gang dues to SAP leaders. He agrees that his involvement in drug trafficking affected interstate and foreign commerce.

On December 2, 2023, at the age of 18, as he was returning home to Acosta Plaza from attending school near Sacramento, he and another individual observed a known former member of the Norteño gang (a "dropout") moving furniture in Acosta Plaza. PSR ¶ 21. As admitted to in his plea agreement and corroborated by surveillance footage, the defendant and another SAP member initially saw the victim and then observed him for several minutes. They then walked to an apartment to retrieve a firearm. Both men then returned to the area where the victim was still moving furniture. The defendant ran up to the victim and shot him several times in the neck, torso, arm, and leg. *Id.* The victim subsequently died. The defendant committed this murder to increase his standing with SAP gang members by committing an act

UNITED STATES' SENTENCING MEMORANDUM   3
5:24-CR-00226-BLF-011

of violence against a Norteño who had violated gang rules and to bolster SAP's reputation on the street. *Id.* At the time of this offense, Saldana was a member of SAP and this offense elevated his status within the gang. *See id.* Specifically, Instagram records indicate that the defendant became "certified" as a result of this killing, as vouched for by the other SAP member who had accompanied him and observed him do it.

On February 29, 2024, at the age of 19, the defendant and another SAP member observed a former member of the Norteño gang (a dropout) in Acosta Plaza. *See id.* ¶ 22. They approached the man as he was in the driver's seat of his vehicle trying to back out of his parking spot. The defendant fired several shots at the man through the vehicle's passenger window. He hit the man twice in the arm, but the man survived. The defendant admits that he participated in this shooting in order to increase his standing within SAP and to bolster SAP's reputation on the street.

On November 28, 2024, at the age of 19 and while in federal custody for the instant offense, he was caught in jail carrying a homemade knife (commonly known as a "shank") on his person by a correctional officer. *Id.* ¶ 23. The shank was hidden in a sock concealed in his pants. He knowingly possessed this dangerous weapon and knew he was not permitted to possess it inside a custodial facility.

## IV.    SENTENCING GUIDELINES CALCULATION

The government agrees with Probation that the base offense level is 44 after grouping, minus 3 for acceptance of responsibility, resulting in a total offense level of 41. *Id.* ¶ 55. The government also agrees with the calculation of Criminal History Category II. *Id.* ¶ 62. Together, the guidelines range is 360 months to life. *See id.* ¶ 90. The statutory maximum is life in light of the defendant's admission to a special sentencing factor. *See* 18 U.S.C. § 1963(a).

## V.    APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light

UNITED STATES' SENTENCING MEMORANDUM    4
5:24-CR-00226-BLF-011

of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991-93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense; (3) the need for the sentence to afford adequate deterrence; (4) the need for the sentence to protect the public from further crimes of the defendant; (5) the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

## VI.    RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS

Upon consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a)—and in particular the need for the sentence to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, and to protect the public—the government respectfully recommends a sentence of 264 months' (22 years) imprisonment.

*a.  Targeting Gang Dropouts*

Both of the shootings here targeted men who had dropped out of the Norteño gang.  That is, they had spent at least some time in the same gang as the defendant, but they had tried to move on with their lives.  The decedent on December 2, 2023, for example, was killed while he was moving furniture in Acosta Plaza.  He certainly knew the danger of dropping out of the Norteños in the first place—it is, after all, a common rule across all Norteño subsets that dropouts are to be attacked—and he surely knew the danger of going into a known gang stronghold like Acosta Plaza that afternoon, but he did it anyway for his livelihood and for the sake of his family.  The defendant spotted him in Acosta Plaza when he (the defendant) was on his way back from attending school in Sacramento.  He too was trying to better himself by getting an education, yet instead of moving on with his life as the victim had done, the defendant decided to go in another direction: shooting and killing the victim and getting "certified" in the process. The defendant then tried to do it again, shooting another dropout just a few months later on February 29.

UNITED STATES' SENTENCING MEMORANDUM   5
5:24-CR-00226-BLF-011

b. *Age at the Time of the Offense*

Unlike some of the other defendants in this case, both of the defendant's shootings took place while he was an adult. Nevertheless, he was still a young adult at the time: 18 years old for the murder, and 19 years old for the attempted murder, and 21 years old now. While the age policy statement was deleted from the Sentencing Guidelines as of November 1, 2025, the underlying principles remain and may still be considered under 18 U.S.C. § 3553(a)(1) as "history and characteristics of the defendant." *See* U.S.S.G. § 5H1.1 (2025). Those principles include the fact that his brain is still developing, he is more impulsive, and he is more susceptible to outside influences. *See generally* U.S.S.G. § 5H1.1 (2024). Although he admits "it was easy growing up as a kid," *see* PSR ¶ 68, he also faced the challenge of having an older brother (Jesus Saldana) who was involved in the gang and is now one of his co-defendants in this case.

c. *Protection of the Public*

Looking at the defendant's record, there are both concerning and promising signs. On the one hand, he was attending school and also working part-time in Sacramento while living in Salinas. *See id.* ¶ 70. That takes dedication, and it is evident that he was working hard to improve his circumstances. He also, as part of this plea agreement, accepted responsibility for not only the December 2, 2023 murder (which was a special sentencing factor against him in the indictment) but also the February 29, 2024 attempted murder (which had not yet been charged in the case). That helped provide closure to an additional victim. It perhaps signals a capacity to be better. On the other hand, he clearly was not and still is not ready to fully extricate himself from this gang life. In November 2024, while in custody on the instant offense, he was caught with a homemade shank. There is no evidence that he had committed an act of violence with it, but it is still very concerning.

## VII.   VICTIM IMPACT AND RESTITUTION

Despite its outreach efforts, the government has not received any victim impact statements pertaining to the time period in which the defendant was involved in the racketeering conspiracy. The government is also not aware of any victims who wish to speak at sentencing, or any restitution requests at this time. If any are received prior to or at sentencing, the government will inform the Court.

UNITED STATES' SENTENCING MEMORANDUM   6
5:24-CR-00226-BLF-011

## VIII.   CONCLUSION

Jose Saldana is one of the young shooters among the Salinas Acosta Plaza (SAP) Norteños.  He pulled the trigger on two separate occasions, killing one person and wounding another.  That harm can never be undone and it fully merits a lengthy term of imprisonment.  Balancing that with some of the other factors here—including his age at the time, his age now, and his acceptance of responsibility—leads the government to recommend a sentence of 264 months (22 years).  The government hopes that this sentence will put the defendant on a corrective course and that once he is released many years from now, definitely no longer a young man, he will get himself on the right track and start contributing positively to society just as his victims had been trying to do.

DATED:  February 26, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/*
GEORGE O. HAGEMAN
JARED S. BUSZIN
Assistant United States Attorneys

UNITED STATES' SENTENCING MEMORANDUM    7
5:24-CR-00226-BLF-011